523 S.E.2d 459

**Ronald DOVE, Petitioner,**

v.

**STATE of South Carolina, Respondent.**

**No. 25019.**

Supreme Court of South Carolina.

Submitted Oct. 20, 1999.

Decided Nov. 22, 1999.

Rehearing Denied Jan. 5, 2000.

---

Deputy Chief Attorney Joseph L. Savitz, III, of the South Carolina Office of Appellate Defense, Columbia, for petitioner.

Attorney General Charles M. Condon, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Teresa A. Knox, and Assistant Attorney General J. Benjamin Aplin, all of Columbia, for respondent.

WALLER, Justice:

A jury convicted Ronald Dove (petitioner) of murdering his estranged wife. This Court affirmed. *State v. Dove*, Op. No. 91–MO–266 (S.C. Sup.Ct. filed September 18, 1991). Petitioner filed a post-conviction relief application, which a circuit judge denied after an evidentiary hearing. We granted the petition for a writ of certiorari to review that decision, and now reverse.

## FACTS

Petitioner returned to Anderson for several days to visit his estranged wife, Sandra Dove (victim) and their children. He stole a credit card and a small handgun before the trip from his sister-in-law in Texas, where he was living. Petitioner's sister-in-law discovered the theft March 9, 1990, a few days after petitioner left for South Carolina. She immediately reported it to Anderson police; the victim's mother, Barbara Junkins; and petitioner's sister in Anderson.

The victim spent a few nights with petitioner at his hotel room. The couple went to a lounge the evening of March 9. There, the victim learned about the stolen credit card and gun from a lounge employee who had spoken to petitioner's sister. The news visibly angered the victim, and she and petitioner left at about 9:30 p.m.

The next afternoon, Anderson police went to petitioner's hotel to serve him with a bad check warrant in an unrelated case. Petitioner refused to open the door. When police tried to force it open, he placed the handgun to his head. The officers retreated, then negotiated with petitioner for several hours. Police ultimately rushed into the room, subdued petitioner, and discovered the victim's body.

The State alleged petitioner shot at the victim three times the previous evening after a fight about the thefts. The gun misfired once, one bullet struck a paneled wall, and the final bullet killed the victim. The fatal wound to the left temple area was inconsistent with a self-inflicted injury because the victim was right-handed, the pathologist testified. He based his opinion on the angle of the bullet, the bruises on the victim's head, and the fact the entrance wound was on the victim's left side. However, the pathologist conceded it was possible the victim shot herself with her left hand. The victim had seriously injured her right hand at work a few months before her death, and had worn a cast for several weeks, a defense witness testified.

Petitioner testified he and the victim returned to his hotel room that night, still arguing about the credit card and gun. He tried to apologize, but the victim was very upset. The victim took the handgun from a drawer and shot at him as he emerged from the bathroom. He ducked back into the bathroom and locked the door. Neither spoke for more than twenty minutes, petitioner testified. He heard a gunshot and some "bumping going on." He opened the door and heard the victim say she was hurting, but she was dead when he walked over to her. He refused to let police enter the hotel room the next day because he believed they would accuse him of murdering the victim, and he was scared of police because they had beaten him in the past, petitioner testified.

Petitioner denied shooting the victim and said he loved her. He testified he tried to kill himself "many times" after the victim died that night, as well as during the standoff the following day, but could not pull the trigger. He testified he first told police after they took him to jail that he believed the victim had committed suicide. He knew the victim had been involuntarily admitted to a mental hospital for drug abuse

problems, but did not know whether the commitment was for psychological problems. On cross-examination, he testified he did not know exactly how the shooting occurred, but the victim "could have been playing around and shot herself."

The victim's mother, Ms. Junkins, testified the victim had never threatened to commit suicide, although she had been admitted twice to psychiatric facilities for substance abuse problems during the two years before her death. The prosecutor tried to nullify any evidence that the victim committed suicide by emphasizing she had a regular job at the time and exhibited no signs of depression. During closing arguments, the prosecutor told jurors that family and friends believed the victim was neither depressed nor suicidal, and explained how she believed the evidence showed it was not suicide.

At the PCR hearing, petitioner's trial attorney testified he did not investigate the victim's medical background; nor did he recall petitioner asking him to obtain the victim's medical records. Petitioner's sister handed the attorney a note during the trial asking why the victim had been committed and suggesting he obtain the medical records. The attorney testified he believed it was too late to obtain and use the records, although he probably could have gotten them. He conceded at the hearing that petitioner could have used the records in his defense if they contained evidence of suicidal tendencies or depression.

The medical records show that from July 1988 to December 1989, three months before her death, the victim was twice admitted to a psychiatric facility. She was diagnosed with substance abuse problems and depression. The records contain numerous references to her repeated threats to commit suicide. In October 1988, the victim's mother swore in an affidavit for emergency admission that the victim repeatedly had expressed suicidal thoughts. That sworn statement directly conflicted with the mother's testimony at trial, when she said the victim had never expressed suicidal thoughts.

After reviewing the records, the PCR judge stated in a letter to the parties that he had "serious concerns" about trial counsel's failure to subpoena them for possible use at trial. Nevertheless, after further consideration, the judge denied petitioner's application.

## ISSUE

Does probative evidence support the PCR judge's decision to deny petitioner's application because his attorney was not ineffective in failing to subpoena and use at trial medical records revealing the victim's past suicidal tendencies?

## DISCUSSION

Petitioner alleges the PCR judge erred in denying his application because his trial attorney was ineffective in failing to subpoena and use at trial medical records revealing the victim's past suicidal tendencies and history of depression. We agree.

■ "To establish a claim of ineffective assistance of trial counsel, a PCR applicant has the burden of proving counsel's representation fell below an objective standard of reasonableness and, but for counsel's errors, there is a reasonable probability that the result at trial would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial." *Johnson v. State*, 325 S.C. 182, 186, 480 S.E.2d 733, 735 (1997) (citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Thus, a PCR applicant must show both error and prejudice to win relief in a PCR proceeding. *Scott v. State*, 334 S.C. 248, 513 S.E.2d 100 (1999).

■ The burden is on the applicant in a post-conviction proceeding to prove the allegations in his application. *Butler v. State*, 286 S.C. 441, 334 S.E.2d 813 (1985). An appellate court must affirm the PCR court's decision when its findings are supported by any evidence of probative value. *Cherry v. State*, 300 S.C. 115, 386 S.E.2d 624 (1989). However, an appellate court will not affirm the decision when it is not supported by any probative evidence. *Holland v. State*, 322 S.C. 111, 470 S.E.2d 378 (1996).

■ We conclude the PCR judge erred because no probative evidence supports his decision. Petitioner has shown both error and prejudice.

Petitioner's trial attorney erred in failing to subpoena the medical records and use them at trial. The records are

replete with evidence about the victim's past suicidal tendencies and depression, evidence that would have been crucial in trying to prove the victim committed suicide.

Petitioner was prejudiced because he was unable to present relevant and important evidence supporting his assertion that his wife committed suicide. For example, petitioner could have used the medical records to challenge the testimony of the mother that her daughter never had suicidal thoughts. The State's case consisted entirely of circumstantial evidence and, while the State's theory was plausible, petitioner's suicide theory also was plausible. Investigators, for instance, found no gunpowder residue on the hands of either petitioner or the victim; nor did they find any blood splatters indicating a close-range shooting on petitioner's clothes. We hold that the fact the jury never had a chance to consider medical records containing crucial evidence about the victim's suicidal tendencies and depression undermines confidence in the outcome of petitioner's trial.

The State argues the records are consistent with the PCR judge's findings and corroborate Ms. Junkins and petitioner's trial testimony that the victim was committed for substance abuse problems. The suicide threats were simply the result of those problems, not the underlying cause of the commitment, the State contends.

We find the State's arguments unpersuasive. The victim's substance abuse and mental problems likely were related, but it makes no difference precisely why she may have wanted to kill herself. The point is that she may have wanted to end her life, for whatever reason, and petitioner did not have a chance to introduce relevant and material evidence of those suicidal tendencies.

This case is easily distinguished from *Stokes v. State*, 308 S.C. 546, 419 S.E.2d 778 (1992). In that case, the petitioner contended her trial attorney was ineffective in failing to call witnesses whose testimony purportedly would have supported her theory that the victim committed suicide. The Court held counsel was not ineffective, but had employed a legitimate strategy by calling only the witness he believed would be credible. Other potential witnesses vacillated when offering their recollections to the attorney and presented no evidence

that victim actually committed suicide. In this case, petitioner's attorney did not employ a legitimate strategy, but failed to obtain and use medical records that plainly supported petitioner's contention that his wife committed suicide.

## CONCLUSION

We reverse the PCR judge's denial of petitioner's application and grant him a new trial.

**REVERSED.**

FINNEY, C.J., TOAL, MOORE and BURNETT, JJ., concur.